965 F.2d 289
 SHANGO (Cleve Heidelberg, Jr.), Plaintiff-Appellant,
v.
Mary JURICH, Allyn Sielaff, David Brierton, Robert Kapture
and Charles DeYoung, Defendants-Appellees.
Sylvester HENDERSON, Plaintiff-Appellant,
v.
David BRIERTON, Mary Jurich, Robert Kapture, Arthur
Wallenstein and Art Moen, Defendants-Appellees.
 No. 89-2620.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 12, 1991.
Decided June 2, 1992.
 
 Frank S. Merritt, Legal Assistance Foundation of Chicago, George J. Casson, Jr. (argued), Bell, Boyd & Lloyd, Chicago, Ill., for plaintiffs-appellants.
 Richard M. Carbonara, Lawrence R. LaSusa, William D. Frazier, Elizabeth M. Scarano, Susan Frederick Rhodes (argued), Asst. Attys. Gen., Office of Atty. Gen., Jerome F. Goldberg, Goldberg & Murphy, Chicago, Ill., for defendants-appellees.
 Before WOOD, Jr.,* COFFEY, and EASTERBROOK, Circuit Judges.
 HARLINGTON WOOD, JR., Circuit Judge.
 
 
 1
 This appeal of two consolidated cases presents two issues, aspects of which plaintiff Shango, nee Cleve Heidelberg, Jr., an inmate at the Stateville Correctional Center, Joliet, Illinois, first raised nearly two decades ago.[1] Today, we affirm the judgment of the district court that Stateville provides constitutionally adequate access to the courts and that $1.00 is the appropriate remedy for the violation of Shango's procedural due-process rights in a 1980 disciplinary hearing.
 
 
 2
 The access issue arose in 1974, picked up three more cases along the way, became consolidated as a class-action suit in December 1977 with Shango being a class representative, and paused briefly when the parties entered a partial consent decree, August 28, 1981, requiring Stateville to make changes in its law library and legal-assistance program. Not satisfied, both Shango and the defendants, various library and State correctional officials, moved for summary judgment, but the motions were denied May 20, 1983. The parties proceeded toward trial, picking up an additional element in October 1984, a motion to enforce the 1981 consent decree.
 
 
 3
 Meanwhile, a second issue emerged in December 1980 when Shango filed a supplemental complaint, alleging numerous due-process deprivations. Some but not all of these have been dispatched. Shango v. Jurich, 681 F.2d 1091 (7th Cir.1982) (reversing and remanding Shango v. Jurich, 521 F.Supp. 1196 (N.D.Ill.1981)) ("Shango II " and "Shango I," respectively). Liability on the remaining due-process issues was resolved by entry of summary judgment April 10, 1985: only a disciplinary hearing held July 26, 1980, violated Shango's due-process rights, and the appropriate remedy was to be determined later at trial. Shango v. Jurich, 608 F.Supp. 931 (N.D.Ill.1985) ("Shango III ").
 
 
 4
 Thus, the legal-access issue and the remedy aspect of the due-process claim went to trial in September 1985. Ultimately, the district court determined that the Stateville law library and the legal-assistance program were constitutionally adequate, that only the library's record-keeping violated the consent decree, and that Shango would receive $1.00 in nominal damages. Shango v. Jurich, Nos. 74 C 3598, 76 C 3068, 76 C 3379, 77 C 0103, 75 C 3388, and 76 C 3600, 1988 WL 76996, 1988 U.S.Dist. LEXIS 7597 (N.D.Ill. July 15, 1988; filed July 18, 1988), amended, 1989 WL 75446, 1989 U.S.Dist. LEXIS 7707 (N.D.Ill. June 23, 1989; filed June 27, 1989) ("Shango IV " and "Shango V, " respectively).
 
 ANALYSIS
 
 5
 This case arose under the Fourteenth Amendment and 42 U.S.C. § 1983. Thus, the district court had jurisdiction. 28 U.S.C. §§ 1331, 1343. Its judgment was dated July 15, 1988, and filed July 18, 1988. Within the ten days prescribed by Fed.R.Civ.P. 59 Shango filed motions for judgment notwithstanding the verdict and for a new trial, and the defendants timely filed a motion to amend the judgment. The court denied the first two motions and partially granted the last in a memorandum opinion and order dated June 23, 1989. The corresponding minute order was dated and stamped "received for docketing" June 26, 1989, but appears not to have been docketed until the next day. Accordingly, Shango's notice of appeal, filed July 26, 1989, survives the directive of Fed.R.App.P. 4(a)(4) that the time for appeal "shall run from the time of entry of the order" denying or granting a Rule 59 motion. See Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin, 957 F.2d 515 (7th Cir.1992). The notice, however, does not comply with the requirement of Fed.R.App.P. 4(a)(1): "the notice of appeal required by Rule 3 shall be filed ... within 30 days after the entry of the judgment appealed from...." Although the judgment appealed, and subsequently amended, was dated July 15, 1988, and filed July 18, 1988, it was not entered until July 28, 1989, two days after Shango filed his notice of appeal. Nonetheless, this appeal is saved by Rule 4(a)(2), which treats notices of appeal filed after announcement of the decision but before entry of judgment "as filed after such entry and on the day thereof." Thus, we have jurisdiction. 28 U.S.C. § 1291.
 
 ACCESS
 
 6
 Even persons who have been lawfully deprived of certain rights and imprisoned are not deprived of all rights; among the remaining rights is access to the courts. Accordingly, prison authorities are required "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds v. Smith, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977) (emphasis added; footnote deleted). The "legal access program need not include any particular element ... [but] must be evaluated as a whole to ascertain its compliance with constitutional standards." Id. at 832, 97 S.Ct. at 1500 (footnote omitted). Thus, prison officials need not provide both an adequate law library and adequate legal assistants, nor must they provide any particular element. Rather, the program as a whole must pass constitutional muster; it must provide meaningful access to the courts.
 
 
 7
 Consistent with these holdings, the district court found: "Although the present system [at Stateville] is not perfect, it is constitutional and generally in compliance with the Consent Decree." Shango IV, slip op. at 69. Shango had alleged numerous infirmities in Stateville's legal-access program. The district court found the program as a whole was in compliance with constitutional standards: the law library was adequate and the prisoners had adequate access to it. The court found only one infirmity, and that one was not a constitutional infirmity but a simple breach of the part of the 1981 consent decree requiring the library to keep adequate records of its use.
 
 
 8
 On appeal Shango, nonetheless, persists in challenging several of the court's determinations on individual aspects of Stateville's law library and legal-assistance program. He directly questions both the court's interpretation of the law and its conclusions of law that applied law to fact. He indirectly questions some findings of fact but does not argue that any are clearly erroneous. Consequently, we accept the findings of fact as stated in Shango IV.
 
 
 9
 Appellate review of pure questions of law is de novo, a standard so widely accepted it is frequently applied without citation. Oneida Tribe of Indians v. State of Wisconsin, 951 F.2d 757, 760 (7th Cir.1991). Conversely, we review mixed questions of law and fact deferentially "when it appears that the district court is better positioned than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine." Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217, 1222, 113 L.Ed.2d 190 (1991) (quotation marks and citation omitted). That is the situation here: prisoners' right of access to the courts has been well elucidated by Bounds and its progeny, and Judge Williams had the opportunity to carefully scrutinize the many witnesses, their testimony, and numerous exhibits during the 15 days' trial.
 
 
 10
 The relevant facts are straightforward. Stateville is a maximum-security, state prison, housing a bit over 2300 inmates. General population inmates are assigned to one of five cellhouses. Inmates under investigation and in disciplinary segregation are sequestered in a separate cellhouse, and so are those is protective custody. New arrivals are kept one to two weeks in an orientation cellhouse, and Stateville maintains separate hospital facilities.
 
 
 11
 The law-library collection at Stateville conforms to the minimum standards established by the American Association of Law Libraries, but access to the library is restricted. It is closed nights, weekends, and holidays and may be closed at other times due to lockdown, construction, or shortage of guards or librarians. The library seats 80 to 100 persons and contains nine, single-occupancy study cells. General population inmates may visit and freely utilize the prison's law library, optimally for 10 to 11 hours, one day each week, according to their assigned cellhouse. Segregation and protective-custody inmates may visit the library for about three hours every third to fifth weekday, but their access is limited to seven of the nine study cells. They may not enter the rest of the library and must depend on resident legal-clerks, trained and provided by the library, to secure desired books and the like from the shelves. Not every inmate gets to visit the library on his assigned day; thus, some may miss a turn. Frequently, part of the inmates' allotted library time is consumed moving en masse to and from their housing unit, with meals, in other scheduled activities, and by proverbial delays. Lastly, inmates who verify a litigation deadline within thirty days can receive additional time in the library. These facts are not in dispute; their meaning is.
 
 
 12
 Shango first argues the court improperly shifted to him the burden of proving Stateville's program inadequate, although it is the defendant's burden to prove the program adequate. Not so; the court did not improperly shift burdens. The basic framework for decision was settled by Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987): "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." The constitutional right of "meaningful access" described in Bounds, however, can be satisfied many ways. For example, it is satisfied if prisoners "receive that quantum of access to prison libraries--not total or unlimited access--which will enable them to research the law and determine what facts may be necessary to state a cause of action." Hossman v. Spradlin, 812 F.2d 1019 (7th Cir.1987) (citing Campbell v. Miller, 787 F.2d 217, 226 n. 15 (7th Cir.), cert. denied, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986)); Martin v. Davies, 917 F.2d 336, 338 (7th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2805, 115 L.Ed.2d 978 (1991). Library access may be restricted by time, place and manner regulations that are "justified in light of legitimate security considerations." Caldwell v. Miller, 790 F.2d 589, 606 (7th Cir.1986); see also Hossman, 812 F.2d at 1021 n. 1. Because the obligation to provide reasonable, or meaningful, access falls on prison officials, they "bear the burden of proving the adequacy of the means provided." DeMallory v. Cullen, 855 F.2d 442, 446 (7th Cir.1988) (citing Campbell, 787 F.2d at 225-26). Nevertheless, our case law makes it clear that even to survive a motion for summary judgment, the plaintiff must "allege some quantum of detriment caused by the challenged conduct of state officials resulting in the interruption and/or delay of plaintiff's pending or contemplated litigation." Hossman, 812 F.2d at 1021-22 n. 2 (emphasis added); Howland v. Kilquist, 833 F.2d 639, 642-43 (7th Cir.1987); Bruscino v. Carlson, 854 F.2d 162, 167 (7th Cir.1988), cert. denied, 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989); Martin, 917 F.2d at 340.[2] It should go without saying but here obviously cannot: It requires more to win at trial than it does to survive a motion for summary judgment.
 
 
 13
 The court correctly understood and applied the law. Shango alleged at most an impingement, not a total abrogation, of meaningful access. Judge Williams considered and found the defendants' evidence persuasive: the defendants had legitimate security concerns in limiting prisoners' access to the law library, and the imposed limitations denied neither Shango nor any other prisoner meaningful access. The court then properly asked Shango: where's the detriment, where's the interruption or delay, how have you been prejudiced? See Shango IV, slip op. at 55, and Shango V, slip op. at 19-20. Shango, however, appears to have presented no evidence of any delay or interruption in pending or contemplated litigation, let alone any detriment or prejudice suffered by any prisoner or class of prisoners.[3]
 
 
 14
 This brings us to three of Shango's four remaining claims of court error regarding the access issue. He argues that Stateville's inadequate record of library use means the district court had insufficient evidence to find the legal-access program adequate. He also argues the court erred in finding that inmates whose physical access to the library facility is limited to the study cells--namely, prisoners in segregation and protective custody--and that illiterate inmates are provided adequate access to the courts.
 
 
 15
 We dispose of these arguments in short order. The district court found that neither Shango nor any other Stateville prisoner, whether in the general population, protective custody, or segregation, offered evidence either of actual prejudice in filing or pursuing legal actions or of an adverse legal judgment attributable to Stateville's existing practices and regulations. Shango IV, slip op. at 55, 58-59, 63. To the contrary, the inmates are, as the court stated, "prolific litigators." Between January 1984 and April 1985, 210 civil-rights cases were filed in the District Court for the Northern District of Illinois; Stateville inmate Joe Woods testified he had filed approximately five habeas-corpus petitions per month between April and September 1985; and Shango admitted filing one to two § 1983 actions per week while at Stateville. Id. at 36. Additionally, the court found no evidence that either the orientation or hospitalized inmates were prejudiced. Id. at 63-64. In light of the inmates' demonstrated access to the courts, the district court's finding they were not prejudiced, and Shango's citing no evidence of prejudice in the record, we must conclude that no Stateville inmate, whether literate or illiterate, presented evidence of having been prejudiced in any legal action.
 
 
 16
 Furthermore, the district court identified many indicia of the defendants' complying with Bounds. For example, illiterate inmates have access to resident legal-clerks and jailhouse lawyers. Shango V, slip op. at 30-31. Additionally, resident legal-clerks are granted one-month detail passes, good from 7:00 a.m. to 3:00 p.m., seven days a week, to visit inmates in segregation and protective custody, as well as those in the hospital and orientation units. Shango IV, slip op. at 34-35, 44. Inmates may confer with jailhouse lawyers; but access is limited to those within their own housing unit, and the meetings must take place in the library without disturbing other users. Id. at 47-48. Lastly, the resident legal-clerks are an important element. They are inmates employed at the library. They must possess the equivalent of a high school education, must take a four-to-six month, one and one half-to-two hour a day, training course in civil procedure, criminal law, English, and Spanish, and must take a legal skills test. Id. at 46.
 
 
 17
 Accordingly, we cannot say the court abused its discretion or erred in any way that contraindicates our deferring to its judgment for the defendants.
 
 
 18
 Shango's final claim of error is that the district court's holding directly contradicts our holding in Williams v. Lane, 851 F.2d 867 (7th Cir.1988), cert. denied, 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989). To affirm the district court here we need not distinguish Williams, although we think it is distinguishable. For example, the Williams plaintiffs were exclusively protective-custody inmates, and the defendants made no effort to bear their burden of proof other than to rely upon "reflexive, rote assertions" of a superior security interest. Williams, 851 F.2d at 873, 886 (Flaum, J., concurring).
 
 
 19
 What we did in Williams was to affirm, under the clearly erroneous standard, the judgment of the district court that the plaintiffs did not have "meaningful opportunities to exercise ... [their] court access rights." Id. at 877, 880. Here, we are asked to affirm, under a similarly deferential standard, the judgment of the district court that Shango and his co-plaintiffs did have meaningful access to the courts. The truth is that different district court judges may justifiably and justly view the same or highly similar evidence differently. Thus, where appellate review is deferential, as opposed to de novo, seemingly contradictory, if not flatly contradictory, judgments may well be affirmed.[4] Even if Williams is not distinguishable, we can affirm the Shango court without expressly or implicitly overruling Williams because we are affirming a judgment the trial court has discretion to make; we are not making or changing law. Consequently, Shango's assertion of error fails and the district court's judgment is affirmed.[5]
 
 DAMAGES
 
 20
 In Shango III the court found that, as a matter of law, a Resident Disciplinary Report issued July 25, 1980, charging Shango with violating certain prison rules, and the subsequent Adjustment Committee hearing on July 26, 1980, had violated his procedural due-process rights. Shango III, 608 F.Supp. at 938-40. Having found liability, the court ordered a trial on the question of remedy per Carey v. Piphus, 435 U.S. 247, 260, 98 S.Ct. 1042, 1050-51, 55 L.Ed.2d 252 (1978). Shango III, 608 F.Supp. at 940-41. It also ordered that "any relevant evidence may be offered by either party, whether or not part of the administrative record of the disciplinary proceedings." Id. at 941 (citing Redding v. Fairman, 717 F.2d 1105, 1118 (7th Cir.1983), cert. denied, 465 U.S. 1025, 104 S.Ct. 1282, 79 L.Ed.2d 685 (1984)).
 
 
 21
 As the story goes, Shango paid another inmate, Griffin, to force Griffin's cellmate, Edwards, to have sex with Shango, and they did, at least once. Edwards complained to the authorities, and Shango was charged with violating two Administrative Regulations of the prison: (1) both procuring one to pressure another into engaging in unnatural sexual activity and engaging in unnatural sexual activity and (2) violating the general laws of the State or United States. Id. at 934. Shango was informed that Edwards was the victim, that the assault occurred in June 1980, and that a polygraph exam showed Edwards was telling the truth about both the sexual activity and its procurement. Neither the Resident Disciplinary Report of July 25 nor the Adjustment Committee at the hearing on July 26, however, disclosed the date, time or location of the alleged attack, that Griffin was the alleged co-conspirator, or the recorded results of the polygraph exam Edwards had taken. The Shango III court held (a) the date-time-place information was not improperly withheld because the information simply was not available, given the imprecision of Edwards's recollection on that point;[6] (b) Griffin's name and the record of the polygraph exam were improperly withheld; and (c) the improperly withheld information bore only on the charge of procuring one to pressure another to engage in unnatural sexual activity, not on the charged sex-act itself. Id. at 939-40.
 
 
 22
 The district court then conducted a trial to determine the appropriate remedy, properly asking whether the outcome of the disciplinary hearing would have been the same even if Shango had been given Griffin's name and a copy of Edwards's polygraph-exam results. Shango III, 608 F.Supp. at 940; see Carey, 435 U.S. at 260, 98 S.Ct. at 1050-51. Judge Williams found Shango would have been disciplined anyway and, thus, was only entitled to nominal damages of $1.00. Shango IV, slip op. at 94. On appeal Shango contends "it was error for the District Court to consider evidence on the disciplinary violation because defendants still did not comply with due process by giving him adequate notice of the charges against him." Appellant's Brief at 49. This contention is without merit for the simplest of reasons.
 
 
 23
 Shango had the improperly withheld information before the Shango IV trial commenced. The memorandum opinion and order in Shango III, decided April 10, 1985, stated Griffin was the alleged co-conspirator whom Shango had paid and that the polygraph-exam results disclosed Griffin's name. Recall, first, these are the only parcels of information that had been improperly withheld, and, second, the precise date, time and location of the alleged act had not been improperly withheld, which makes Shango's many pages of appellate argument to the contrary meaningless. Thus, Shango had all of the improperly withheld information five or more months before the remedy trial began in September.
 
 
 24
 But Shango had more; he had at least seen a copy of the results of Edwards's polygraph exam. The final pretrial-order for the remedy phase of Shango IV, dated September 6, 1985, includes the following item in the defendant's list of exhibits: "GROUP EX 6. Notes of M. Musto as to polygraph examination of Stephen Edwards." The pretrial order also contains plaintiff Shango's objection to the exhibit, stating in part, "Plaintiff further objects that the third page of the exhibit was not produced during discovery." Griffin's name appears on all three pages, but only on pages 1 and 2 does its appearance relate to Shango and his charged misconduct. We need not search the record farther to determine exactly when Shango first acquired, nay, discovered, a copy of the polygraph-exam results; he had it in time for trial.
 
 
 25
 Shango was not denied the information the Shango III court found had been improperly withheld. To argue otherwise is frivolous. The information was supplied both in the earlier proceeding and by the defendants, despite Shango's objection. Moreover, Shango cannot now complain he was not properly informed of the date, time, and place of the alleged act or acts. The Shango III court found otherwise seven years ago, and, anyway, his appeal addresses only the remedy issues raised in Shango IV, not the liability claim that he won earlier. We hold he was not denied procedural due process by the defendants or the court and that the district court did not abuse its discretion but properly considered the evidence on the disciplinary violation. Therefore, we affirm the court's corresponding judgments in both Shango IV and Shango V.
 
 The judgments of the district court are
 
 26
 AFFIRMED.
 
 
 
 *
 Judge Wood, Jr. assumed senior status on January 16, 1992, which was after oral argument in this case
 
 
 [1]
 Plaintiff Henderson joined the fray two years later. His case was subsequently consolidated with Shango's case and two others well before trial, but only Shango and Henderson have appealed
 
 
 [2]
 Other courts of appeals are in accord. See the summary in Chandler v. Baird, 926 F.2d 1057, 1062-63 (11th Cir.1991)
 
 
 [3]
 The district court entered findings of fact that no evidence showed any prisoner suffered delay, interruption, detriment or prejudice in any legal action, either pending or contemplated. We are bound to accept these findings unless they are clearly erroneous, and Shango has not identified any finding of fact he considers clearly erroneous
 
 
 [4]
 This occurs because, on deferential review, a judgment may not be reversed simply because there is more than one plausible interpretation of the evidence and the appellate judges prefer "the road not taken." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 575, 105 S.Ct. 1504, 1511, 1512, 84 L.Ed.2d 518 (1985); Robert Frost, 116 ATLANTIC MONTHLY 223 (August 1915)
 
 
 [5]
 Our holdings apply equally to Shango individually and as class representative, to the classes he represents, and to Henderson
 
 
 [6]
 The court emphasized that the unavoidable absence of this information "made it all the more important that what was known" to the authorities be given to Shango. Shango III, 608 F.Supp. at 939 (emphasis in original)